## CIRCUIT COURT OF THE CITY OF RICHMOND

Environmental Defense
Fund, Inc., et al.

v.

Virginia State Water
Control Board et al.

### Case Nos. HA-731 and HB-122

By JUDGE T. J. MARKOW

### March 6, 1991

This matter is before the court on the motion of the plaintiffs, the Environmental Defense Fund (EDF), Juan Ramirez, Dr. Benjamin Rice, and Joseph W. Lawler, for a temporary stay of the State Water Control Board (Board) decision to amend VPDES permit No. VA0003646 issued to Westvaco, Inc. Westvaco has been granted permission to intervene.

The plaintiffs ask the court to take this action under the Virginia Administrative Process Act, § 9-6.14:18. Va. Code Ann. (Repl. Vol. 1989). That code section provides intermediate relief to postpone the effective date of a regulation or decision "when judicial review is instituted or is about to be." The court must find that (1) the postponement is necessary to prevent immediate, unavoidable, and irreparable injury; (2) that the issues are substantial; and (3) that there is a likelihood of success in the pending review.

The plaintiffs allege that they initiated an appeal to the decision of the Board to issue the amended permit to Westvaco by notice under Supreme Court Rule 2A:2 on February

5, 1991. They allege that the postponement is necessary to prevent immediate, unavoidable, and irreparable injury because the permit will allow the discharge of effluent into state waters with dioxin levels that fail to protect water quality, public health, and riparian land interests and that, once discharged, there is no known technology to remove or treat the contamination.

The Board argues that there is no irreparable harm and that, to the contrary, the suspension of the permit would be harmful, since without it there is no limit on the amount of dioxin which Westvaco can discharge. However, a standard which limits a danger some incremental amount is not necessarily an appropriate standard simply because it is better than an absence of one. Should the plaintiffs ultimately prevail, there is no way to undo any harm caused by dioxin discharges; however, if the stay is ordered, greater harm is done. The court will not enter an order which would result in greater harm to the environment.

Plaintiffs must also show that the issues of law or fact are substantial and that there is a likelihood of reversible error in accordance with § 9-6.14:17. The substantial error of law identified by the plaintiffs is the Board's refusal to hold a public hearing, which the plaintiffs allege is a failure of the Board to follow its own rules and regulations, rendering its actions arbitrary and capricious. The plaintiffs assert they are likely to prevail in their appeal.

Section 9-6.14:17(iii) identifies "observance of required procedure where any failure therein is not mere harmless error" as an error of law subject to review by the court. The plaintiffs assert that the permit regulation VR680-14-01m § 3.6 Public Comments and Hearings, required the Board to hold a public hearing. The plaintiffs allege that they submitted detailed comments and a request for a hearing to the Board within the requisite thirty-day comment period, which met the criteria established by Procedural Rule No. 1 - Public and Formal Hearing Procedures. The findings which compel the granting of the hearing, under Procedural Rule 1.12 Disposition of Requests for Public Hearing, are (1) significant public interest in the permit; (2) substantial disputed issues relevant to it; (3) the action requested is in conformance with state

and federal laws; or (4) that a public hearing is required by statute.

The public interest in controls of dioxin has been sparked by the imposition of health warnings in four major rivers in our state. The relevant issues are substantial, not mere technicalities, as the discharge levels permitted are the most basic of the determinations made by VPDES permits. The action requested in no way contravenes state or local law. The plaintiffs appear to have met the three conditions required to be granted a hearing. Further, the state Water Control law § 62.1-44.15(5b) provides: "Any certificate issued by the Board under this chapter may, *after notice and opportunity for a hearing*, be amended or revoked . . . ." (emphasis supplied), indicating the intention of the organic law, not just the regulations, to provide for a hearing. There is a likelihood that the plaintiffs may prevail.

Having determined that greater harm will be occasioned by issuance of the stay, the court will refuse to grant the plaintiffs temporary relief.

### August 7, 1991

The State Water Control Board adopted a regulation establishing a water quality standard for the discharge of dioxin into the waters of the Commonwealth on May 14, 1990. Juan Ramirez, Dr. Benjamin Rice, and Joseph Lawler, along with the Environmental Defense Fund (collectively EDF), a nonprofit membership environmental association, filed this appeal to the adoption of the standard claiming that the Board erred in:

(1) Adopting only that standard which was economically and technologically feasible, contrary to the Water Control Law and Clean Water Act which require a standard that protects all stream uses.

(2) Adopting only that standard which was measurable by current analytical standards.

(3) Failing to incorporate protection against dioxin's short-term health effects, particularly reproductive effects.

(4) Failing to incorporate protection against dioxin's effects on aquatic life; and

(5) Failing to incorporate protection against the bioaccumulation of dioxin in fish tissue, subjecting Virginia's sport fishery to continuing health advisories.

The Administrative Process Act (APA) limits issues on review to errors of law described as errors of (i) constitutionality, (ii) compliance with statutory authority, (iii) observance of required procedure, and (iv) the substantiality of the evidential support for findings of fact. Va. Code Ann. § 9-6.14:17 (Repl. Vol. 1989).

Each of the errors identified by EDF falls, in essence, under the second category, failure to comply with statutory authority, since the root of each is that the Board did not adopt a dioxin standard which would achieve the purpose of the State Water Control Law. This purpose is stated in Section 62.1-44.2 as follows:

> It is the policy of the Commonwealth of Virginia and the purpose of this law to: (1) protect existing high quality state waters and restore all other state waters to such condition of quality that any such waters will permit all reasonable public uses and will support the propagation and growth of all aquatic life, including game fish, which might be reasonably expected to inhabit them, (2) safeguard the clean waters of the Commonwealth from pollution, (3) prevent any increase in pollution, (4) reduce existing pollution, and (5) promote water resource conservation, management and distribution, and encourage water consumption reduction in order to provide for the health, safety, and welfare of the present and future citizens of the Commonwealth.

Additionally, the Water Control Law provides that the powers and duties of the Board include the following mandate:

> To establish such standards of quality and policies for any state waters consistent with the general policy set forth in this chapter . . . . Whenever the Board considers the adoption, modification, amendment or cancellation of any

standard, it shall give due consideration to, among other factors, the economic and social costs and benefits which can reasonably be expected to obtain as a consequence of the standards as adopted, modified, amended or cancelled.

Section 62.1-44.15(3a).

EDF asserts, in its first assignment of error, that the Board considered the economic and social costs to the exclusion of stream uses and, therefore, failed to act within its statutory authority which requires it to protect all reasonable stream uses. The five assignments of error are all part and parcel of this basic premise. The question of a measurable analytical standard, for instance, is a problem based on the potential costs and social consequences of trying to impose a standard which cannot be enforced given the current state of technology.

In arguing that the detection limitation is not as narrow as that found under the current Environmental Protection Agency (EPA) guidelines and that the Board was "free to apply new methodologies and to 'force' technology in the analytical area," EDF strays far from its original premise. That the Board may be "free" to apply new tests and to "force" technology does not impose on it a statutory obligation to do so. Indeed, the Water Control Law provides for a triennial review, at a minimum, which allows for standards to keep in step with technology as it develops. Va. Code Ann. § 61.2-44.15(3a). Such specifics are determining from conflicting reports which to accept as reasonable and reliable detection methods falls within the special expertise of the agency, and it is due a high degree of deference in that area. *See, e.g., Johnston-Willis v. Kenley*, 6 Va. App. 231, 369 S.E.2d 1 (1988). The choice on the part of the Board to use a standard which allows detection by current EPA methodology is not outside of its authority.

Likewise, errors 3, 4 and 5 are charges that the adopted standard fails to protect stream uses. The third error assigned is that the standard fails to protect against short-term health effects. The record reveals that the Board was presented information showing that the standard was based on a formula which used "risk assessment factor" which was derived by the selection of the health effect for which experimental species have shown to be the most

sensitive when exposed to dioxin. The assumption is then made that this most sensitive "end point," which is cancer with dioxin, then protects all less sensitive effects. So, EDF does not meet its burden to show that the Board failed to adopt a standard that protects human health in the usage of streams and instead considered only costs and social consequences.

The fourth error assigned is that the standard fails to incorporate protection against dioxin's effects on aquatic life. EDF admits that "no safe level of dioxin for adequate life had been determined." (Brief in Support of Petition for Appeal, p. 36) The standard which the Board adopted was not designed to protect aquatic life because there is no known basis upon which to do so; however, the standard will reduce the amount of dioxin considerably from what has been discharged in the past, and there is substantial evidence to support the reasonableness of the assumption that aquatic life will be protected by the standard.

The fifth assignment of error is that the standard will contravene stream use by subjecting Virginia's sport fishery to continuing health advisories. This is speculative on the part of EDF. The internal memorandum of the State Health Department, dated September 20, 1989, makes clear that the decision to issue a fish eating advisory was debatable at that point. One of the possible options presented in the memorandum was to take no action. It concluded with the statement that "any of these options could be justified in view of the preceding information, risk estimates, and supporting arguments," and with a recommendation to continue monitoring. With reduced dioxin discharges from the adoption of the standard, the fish advisories may very well be eliminated.

The standard adopted by the Board is what is known as a numeric standard and is derived from a formula which has been used by the EPA and other states. Its use is not attacked by EDF, but the determination of the various elements, for instance, the amount assumed to be the appropriate amount of fish consumed by humans is. For instance, one of the facts used in the calculation is human fish consumption. EDF argues that the amount used is too low, that people, especially in Virginia, as a coastal state, eat more than the number of grams determined by the survey which was used to derive the estimate. However, the determination of

the figures to use in each of the factors is based on defensible science, are within the agency's area of expertise, and are due great deference. The court finds that they are supported by substantial evidence and that the result reached by the agency in adopting a dioxin standard of 1.2 ppq can reasonably be said to be within the scope of the legal authority of the agency. *See* Code § 9-6.14:17.

The court finds that the Board has acted within its statutory authority on all assignments of error. Whether it adopted the "best" standard, exercised the best judgment, or whether it could do better as EDF's appeal suggests are all fairly debatable points but are all beyond the jurisdiction and competence of the courts; therefore, the petitioners' request for relief from the imposition of the standard is denied.

### August 28, 1991

The Environmental Defense Fund has filed a motion for reconsideration of the court's ruling denying the EDF appeal to the adoption of a regulation establishing a water quality standard for the discharge of dioxin in the Commonwealth.

EDF based that motion on two points: (1) that the court erroneously held that "the Board may limit its adoption of water quality standards within the range of current analytical methodology independent of protection of reasonable stream use" and (2) that the "Virginia Department of Health (VHD) decision to issue fish advisories resulting from dioxin contamination was not entitled to due deference and that the Board was not required to adopt a dioxin standard which met the required conditions of the VHD advisories." (Motion for Reconsideration, p. 2)

The first of these is based on a misunderstanding of the court's ruling. The court intended, by categorizing all five assignments of error as failure to comply with statutory authority in not achieving the purpose of the State Water Control Law, to have its discussion on the specifics of each error to be covered with the umbrella of that basic understanding. Thus, when the court said, "the choice on the part of the Board to use a standard which allows detection by current EPA methodology is not outside of its authority," implicit in that finding was

that it did not fail to achieve the purposes of the State Water Control Law, as set forth in § 62.1-44.2 of the Virginia Code and that it did so pursuant to its powers and duties as delineated in § 62.2-44.15(3a).

The second issue raised by EDF is that of the fish advisories. It characterized the court's discussion of the VHD advisories as "failure to defer to the VHD decision." (Motion for Reconsideration, p. 8) Again, EDF misreads the court's letter. The correctness of the VHD's fish advisories was not being evaluated by the court in any sense. The only purpose and use made of the fact of the advisories was an attempt to evaluate EDF's claims that the adopted water quality standard for dioxin would fail to eliminate the advisories.

The dioxin risk analysis is "based on the science policy assumption that the carcinogens pose some risk at any given dose above zero." (File, Exhibit 46, p. 3) As the Board argues, the only standard that would absolutely protect all uses of Virginia's waters is zero. Without giving "due consideration to . . . the economic and social costs and benefits which can reasonably be expected to obtain as a consequence of the standards as adopted," as Section 62.2-44.15(3a) instructs, there would be no standard adopted; the Board would simply have to close down all enterprises which discharge dioxin.

EDF has conceded that some impairment is acceptable by arguing for various figures to place in the formula used to arrive at the numeric standard. Those figures are derived from blends of policy choices (such as how may cancers per given segment of the population can be tolerated) and scientific data (how much dioxin is likely to be ingested from eating a certain number of grams of fish). The ultimate figures to be used are determinations that are made by the application of the special expertise of the agency, limited by the restraints of achieving the purposes of the State Water Control Law. The court concludes that its finding that the board acknowledged those restraints and acted within its legislative authority was correct and overrules the motion to reconsider.